UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

JESSE LANGSTON                    CIVIL ACTION NO. 12-cv-0362

VERSUS                            JUDGE STAGG

WARDEN, LOUISIANA STATE           MAGISTRATE JUDGE HORNSBY
PENITENTIARY

**REPORT AND RECOMMENDATION**

**Introduction**

A Bossier Parish jury convicted Jessie Wade Langston ("Petitioner") of attempted second-degree murder based on evidence that he rammed his SUV into his former girlfriend's car and ran her off the interstate. He was sentenced to 35 years imprisonment. He pursued a number of issues on direct appeal, State v. Langston, 3 So.3d 707 (La. App. 2d Cir. 2009), writ denied, 23 So.3d 912 (La.), and in a post-conviction application. He now seeks federal habeas corpus relief on the grounds that his case was improperly assigned in state court, his counsel was ineffective for several reasons, and the state court did not hold an evidentiary hearing on his post-conviction application. For the reasons that follow, it is recommended the petition be denied.

**Relevant Facts**

Petitioner and Jennifer Maness were in a relationship for about four years, had a child together, and frequently separated and reconciled. Ms. Maness testified that she often moved

out of the home but would come back out of fear.  Her mother described the relationship as "very violent."  Police became involved on a number of occasions.

Ms. Maness testified that Petitioner said that he did not want to do anything with her on her birthday, so she went with friends to a bowling alley.  Petitioner then texted her several times to try to find her.  She finally told him where she was and asked if he wanted to come and share her birthday celebration.  Petitioner arrived, grabbed Maness and told her she needed to come outside with him.  She did, and Petitioner then tried to force her to leave and started dragging her by the arm.  Security guards intervened.  Petitioner would not leave, and he was eventually arrested.  Maness said she dropped the charges because Petitioner "wouldn't leave me alone" and she was fearful of him.

A couple of months later, by which time the couple had broken up, Ms. Maness went to Petitioner's apartment to get some of her property.  While there, Petitioner was on the phone, and Maness was texting her aunt.  Petitioner thought Maness was texting another man, and "without any hesitation he slapped me across the face" and put a bruise on her nose. He then grabbed Maness, threw her against the wall, and threw her phone at her.  Maness later filed a complaint about this incident, and Petitioner was arrested, but Maness dropped the charges after Petitioner got out of jail "and came right back after me."  Maness sometimes got protective orders against Petitioner, but, "He didn't care about those.  He just kept calling me and he just kept following me from work and my home and everything."  Petitioner told Maness that she had to get back together with him and drop the charges.

The couple was together again several months later and bought a house together.  Ms. Maness got home from work and saw Petitioner's cell phone.  She looked through it and saw "nothing but girls' numbers."  Petitioner had cheated on her in the past, so she believed he was again keeping secrets.  She told Petitioner she was leaving.  He then got "really mad" and threw her to the ground.  He put her in a choke hold, put a screwdriver to her throat, and said that he would kill her if she called the police.  He made her promise on her daughter's life that she would not call the police.  He then drug her into a bedroom and would not let her leave.

Ms. Maness finally left after this incident.  Petitioner began sending text messages non-stop.  One of them said, "Breaking Benjamin - bullet w ur name on it."  Another said, "now u know cops ain't got shit on me.  It's time to b scared."  He also sent texts to indicate he was watching her.  One said, "having fun at mother's work lol."  Another was, "I'm like the night everywhere but not visible."  Others were even more threatening: "are u scared u should b," "today will b ur last don't go to sleep cause u won't wake up," and "first I'm going to kill anna (sister) then u then ur piece of shit mom and ur scared ass dad."  Another said, "U will pay with ur life for all u have done u don't deserve to live u don't deserve to be free."  Ms. Maness said she would often delete the messages, but Petitioner would resend as many as 50 of the same message.

One evening after work, Ms. Maness left her car in a parking lot and went tanning with a friend. She later returned to her car and began to drive home.  She was entering I-20

east from the Airline Highway on-ramp when she saw bright blue lights behind her that she recognized as Petitioner's after-market lights on his Kia Sorento SUV.  She picked up her phone to call 911, but Petitioner rammed the passenger side of his vehicle into the driver's side of her car before she could make the call.  Ms. Maness went off the side of the road, and Petitioner drove into the ditch.  Maness was able to get her car back on the road, dial 911, and keep going.  Maness said she did not see Petitioner himself that night, but she did see his vehicle, a distinctive Kia Sorento on which Petitioner had placed several BMW medallions.

Detective B. J. Sanford located Petitioner's SUV.  It was a dry night, but the SUV was dripping from water, and it looked as if someone had tried to wipe away white paint from the black SUV.  Ms. Maness's car was white.  Scrapings were taken from the vehicles but the crime lab reported that it was insufficient material to compare the paints.  Sanford was shown photographs of the vehicles that were admitted into evidence and asked if there was anything compelling or important that he noticed.  He answered, "Yes, sir, the damage matched."  He explained that the areas of damage, paint smears, and tire rubs were consistent.

Petitioner was arrested in Shreveport and originally housed in the Shreveport city jail.  Kevin Larue was one of his bedmates.  Larue was later transferred to the Bossier City jail, where he was familiar with staff member Georgia Myers, Ms. Maness's mother.  Larue said Myers was always nice and treated inmates with respect, and he told her that Petitioner had talked about running her daughter off the road.  Myers had Larue speak to a detective, which led to his testimony.  Larue said that Petitioner told him that he "got arrested for running his

girl off the road or something like that." Larue said Petitioner basically said "that he would rather kill his girl and his daughter to keep the grandmother from getting her or something like that." On cross-examination, he said that Petitioner said "he would rather see his wife and daughter, or girlfriend and daughter dead than to see his daughter wind up with his mother-in-law and his daughter."

The jury, by an 11-1 vote, returned a guilty verdict of attempted second-degree murder. The court originally sentenced Petitioner to 27 years imprisonment. The State later filed a habitual offender bill, and Petitioner received an enhanced sentence of 35 years imprisonment.

**Case Assignment**

Petitioner was first charged with making harassing phone calls. The case was randomly assigned to Division B, Judge Stinson. Given the existing charge, the attempted second-degree murder charge was also assigned to Division B. The prosecutor then filed a "Motion to Transfer Judicial Division" that asked, because both charges involved domestic abuse, that the cases be assigned to Division D, Judge Robinson, which the State explains in its brief was pursuant to a domestic violence program where any felony domestic abuse charges were assigned to Division D and prosecuted by a special prosecutor. Both Judge Stinson and Judge Robinson signed an order approving the transfer. Tr. 18-19.

Petitioner argued in his post-conviction application that the assignment violated <u>State v. Simpson</u>, 551 So.2d 1303 (La. 1989) which held that a challenged criminal case allotment

system violated due process because it allowed the district attorney to choose the judge to whom a particular case was assigned.  Petitioner argued, without any supporting factual basis, that his sentence was "far more onerous than that which he would have received had he been sentenced by the judge then in Division B."  Petitioner makes a related argument that his counsel was ineffective for not objecting to the change of divisions.

The trial court found no merit in the argument because the process employed did not give the prosecutor discretion to choose the judge.  The court also found no prejudice given the merely conclusory claim of a more harsh sentence in one division.  Tr. S722-23.[1]  The appellate court found no error and stated that Petitioner did not "prove that his case was not re-allotted pursuant to a procedure devised by the trial court, or that the district attorney had discretion in choosing which trial judge heard the matter."  He also failed to prove prejudice. Tr. S785.  The Supreme Court of Louisiana denied writs without comment.  Tr. S816.

Habeas corpus relief is available with respect to a claim that was adjudicated on the merits in the state court only if the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  28 U.S.C. § 2254(d).

---

[1] The original record filed by the State was incomplete.  The court ordered a supplemental record, and it was filed.  Doc. 51. Citations to the supplemental record include an "S" to distinguish citations to the original record filed at Doc. 33.

The Supreme Court has held that "clearly established Federal law" within the meaning of the statute is that "determined by this Court, not by the courts of appeals." Lopez v. Smith, 135 S.Ct. 1, 4 (2014). It includes only the holdings, as opposed to the dicta, of the Supreme Court's decisions. Light v. Woodall, 134 S.Ct. 1697, 1702 (2014). Circuit precedent is not grounds for relief even if it purports to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule if the Supreme Court has not yet announced that rule. Lopez, 135 S.Ct. at 4. And a lower court "may not canvass circuit decisions to determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to this Court, be accepted as correct." Marshall v. Rodgers, 133 S.Ct. 1446, 1451 (2013).

Petitioner relies almost exclusively upon the Supreme Court of Louisiana's Simpson decision. That decision stated that it was based upon federal due process concerns, but the Supreme Court of the United States has not clearly established that a randomly assigned case that is then reassigned to a special domestic abuse division upon motion and with the consent of both judges is unconstitutional. A federal circuit court has rejected a claim that the federal constitution requires complete randomness of judicial assignment. U.S. v. Claiborne, 870 F.2d 1463, 1467 (9th Cir. 1989). And the Fifth Circuit has recognized that federal district judges may "by rule, order or consent transfer cases between themselves." U.S. v. Martinez, 686 F.2d 334, 338 (5th Cir. 1982).

Petitioner has not demonstrated that the reassignment in this case ran afoul of clearly established federal law as established by the Supreme Court.  He has also not shown that counsel was ineffective for not objecting to the reassignment.  There is no indication that counsel would have had a valid basis to stop the transfer to the domestic violence division or that his client suffered any prejudice as a result.  Both district judges involved (recently retired) enjoy excellent reputations, and neither is known to hand down sentences appreciably more or less harsh than the other.  Petitioner is not entitled to relief on these claims.

**Ineffective Assistance of Counsel**

### A.  Introduction

Petitioner was represented at trial by Larrion Hillman.  Petitioner's post-conviction application was filed by a new attorney, Gwendolyn Brown.  The post-conviction application argued that attorney Hillman rendered ineffective assistance in a number of ways.  The State filed a two-page answer (Tr. S717-18) that made a generic assertion that the "allegations of ineffective assistance of counsel do not meet the requirements of Strickland v. Washington, 104 S.Ct. 2052 (1984)."  The State asked for an additional 30 days to file a supplement to the answer.  It never did so.

The trial court noted the lack of briefing from the State but proceeded to address the application.  With respect to the Strickland claims, the court listed the eight deficiencies asserted by Petitioner, set forth the elements of a Strickland claim, and summarily found that "Petitioner has failed to meet his burden of proof as set forth in Strickland."  The court added

that all of the alleged failures could reasonably fall within the ambit of trial strategy and that Petitioner had not demonstrated any resulting prejudice.  None of the claims were discussed with any specificity.  Tr. S720-24.  The appellate court issued a similar summary ruling that Petitioner "fails to set forth sufficient factual support to demonstrate that his trial counsel's performance was deficient, or that any alleged deficiencies prejudiced him."  Tr. S785.  The Supreme Court of Louisiana denied writs without comment.  Tr. S816.  The State's brief filed in this court dedicated two sentences to the Strickland claims. Doc. 33, p. 9.

Petitioner argues that the state court erred by not holding an evidentiary hearing to allow him to produce evidence to support his claims.  Whether such a hearing was in order was a matter of state post-conviction procedural law.  A federal habeas applicant is entitled to relief only for a violation of a federal constitutional right, and a claim that the state court improperly applied state law does not constitute an independent basis for federal habeas relief.  Estelle v. McGuire, 112 S.Ct. 475, 479-80 (1991) ("We have stated many times that federal habeas corpus relief does not lie for errors of state law.").  Whether the state courts properly followed their own procedural laws regarding the processing of post-conviction applications is not a viable basis for habeas relief.  The lack of a hearing may, however, affect whether the state court's decision was a reasonable application of federal law.  That will be considered below in assessing the several claims.

### B.  Petitioner's Heavy Burden

To prevail on a claim of ineffective assistance of counsel, a petitioner must establish both that his counsel's performance fell below an objective standard of reasonableness and that, had counsel performed reasonably, there is a reasonable probability that the result in his case would have been different.  Strickland v. Washington, 104 S.Ct. 2052, 2064 (1984). As stated above, habeas corpus relief is available with respect to a claim that was adjudicated on the merits in the state court only if the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  28 U.S.C. § 2254(d).

The statute "bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions" listed above.  Harrington v. Richter, 131 S.Ct. 770, 784 (2011).  "There is no text in the statute requiring a statement of reasons."  Id.  When a federal claim has been presented to the state court and that court has denied relief, it is presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.  Id. at 784-85.  There is no indication that Petitioner's Strickland claims were denied on procedural grounds, so the state court adjudicated them on the merits, and the claims are subject to Section 2254(d) review even though the court issued only a summary ruling that provided no significant explanation for

its decision.  Id.  "Section 2254(d) applies even where there has been a summary denial."

Cullen v. Pinholster, 131 S. Ct. 1388, 1402 (2011).

The question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether the determination was unreasonable, which is a substantially higher threshold. Schriro v. Landrigan, 127 S.Ct. 1933, 1939 ( 2007). The Strickland standard is a general standard, so a state court has even more latitude to reasonably determine that a defendant has not satisfied it.  The federal court's review is thus "doubly deferential."  Knowles v. Mirzayance,129 S.Ct. 1411, 1420 (2009).

"If this standard is difficult to meet, that is because it was meant to be."  Harrington v. Richter, 131 S.Ct. at 786.  Section 2254(d) "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings" and reaches only "extreme malfunctions" in the state criminal justice system.  Id.  Thus, "even a strong case for relief  does not mean the state court's contrary conclusion was unreasonable."  Id.  "[A] habeas court must determine what arguments or theories supported or ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court."  Id.

Finally, review of a Strickland claim under Section 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." Pinholster, 131 S.Ct.

at 1398.  It is reversible error for a federal district court to hold a federal hearing to flesh out such a claim.  Pape v. Thaler, 645 F.3d 281, 288 (5th Cir. 2011).

### C.  Alibi Defense

Petitioner argued in his post-conviction application that, at the time of the car accident, he was at the apartment of Anthony Moore.  Petitioner states that Moore's girlfriend, Katie Moore, was also there.  Petitioner represents that he told his attorney about these potential alibi witnesses, as well as the fact that Petitioner received a phone call from his mother who, after being called by Ms. Maness, called to check on him.  Petitioner states that his mother could have testified that he told her he was with the Moores, whom she could hear in the background, and that Petitioner was calm during the conversation.  The application stated that these facts would be shown at an evidentiary hearing, but the application was not accompanied by any affidavits or other evidence from these prospective witnesses.

"[C]omplaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what the witness would have testified are largely speculative."  Evans v. Cockrell, 285 F.3d 370, 377 (5th Cir. 2000).  In addition, for Petitioner to demonstrate the requisite Strickland prejudice, "[he] must show not only that [the] testimony would have been favorable, but also that the witness would have testified at trial."  Id.  Evans reversed a district court that had granted habeas relief on a similar Strickland claim.  The district court was faulted for assuming that witnesses, from whom no affidavits were presented, would

have testified favorably for the defense. See also Bruce v. Cockrell, 74 Fed. Appx. 326 (5th Cir. 2003)(rejecting Strickland claim because petitioner "did not submit any affidavits by the uncalled witnesses themselves, or offer any evidence that they would have been willing to testify at the punishment phase of his trial."); and O'Brien v. Dretke, 156 Fed. Appx. 724 (5th Cir. 2005) (denying COA when witness's affidavit was submitted but it "d[id] not indicate what the nature of his testimony would have been.")

The state court did not act unreasonably when it rejected this claim on the merits. Petitioner did not offer the state court any evidence to support the bold assertions in his memorandum.

**D.  Text Messages**

The prosecutor obtained admission of the text messages by having Ms. Maness identify them and testifying that they came from a particular cell phone number that she knew belonged to Petitioner.  Defense counsel objected that it was not certain that it was Petitioner who sent the text.  He said, "I don't know if there's a way that you can go online and send text messages for someone putting in random numbers."  He also stated that he did not know for sure that the number at issue was Petitioner's phone number or whether someone else had access to the phone that could have sent the messages to egg on the feud between the couple. The trial judge found the victim's testimony sufficient to allow admission of the texts.  Tr. 242-43.

Petitioner argued in his post-conviction application that he could show at a hearing that he told his attorney that he had worked for a cell phone company and knew it was possible to send texts via the internet.  Petitioner said he also told his attorney that he had taught Ms. Maness how to do that so that they could text one another and avoid cell phone charges.  Petitioner argued that the attorney should have used that information to seek exclusion of the evidence.  The application was supported by an affidavit from a website developer who testified that, as far back as 2005, it was possible to send text messages by email rather than exclusively between mobile phones.  He set forth formats for doing so.  Tr. S602.

Louisiana Code of Evidence Art. 901 provides that authentication or identification as a condition to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.  The rule provides examples of sufficient identification, including testimony that a matter is what it is claimed to be, and telephone conversations evidenced by a call to a number then assigned by the telephone company to a particular person.  The courts have accepted testimony from a victim that a text message came from a particular phone number to authenticate the text as admissible against the sender.  See State v. Thompson, 777 N.W.2d 617, 624-25 (N.D. 2010) (collecting cases from around the country on authenticity of text messages and emails).

Given the victim's long relationship with Petitioner, their extensive history of cell phone communications, and her identification of the text as coming from Petitioner, it is

quite likely the court would have admitted the texts even if counsel had explained how it was technically possible the messages could have been sent by a third person using email and Petitioner's cell phone number.  There has never been any evidence offered to suggest that was the case, so the court likely would have overruled the objection and let the argument go to the weight of the evidence.  It is, therefore, highly doubtful that further objection by counsel would have succeeded in excluding admissibility of the text messages or, more important, also resulted in a different verdict.  Even if the texts had been excluded, the victim would have been able to testify about the couple's extensive history of violence and Petitioner's many threats against her.  These arguments support the state court's decision.  There is a possibility that fairminded jurists would disagree that the state court's decision conflicts with <u>Strickland</u>, so no relief may be granted on this claim.

### E.  Progressive Insurance Evidence

Both cars involved in the incident were insured by Progressive Insurance Company.  Ms. Maness made a claim against Petitioner's policy.  Petitioner denied that he or his vehicle were involved.  Progressive issued a letter to Ms. Maness that stated: "Our investigation revealed that our insured was not involved in this accident."  Tr. S601.  Petitioner argues that counsel should have presented testimony of agents from Progressive to testify that they believed Petitioner was telling them the truth.

The statement by Progressive in its letter went to one of the ultimate issues in the case: Whether Petitioner was driving the vehicle that ran Maness off the road.  It is doubtful the

court would have admitted the evidence any more than it would have allowed a friend or

neighbor to take the stand and say that they believed Petitioner told them the truth.

Moreover, there is scant reason to believe that even if counsel had been able to secure the

admission of this evidence it might have changed the verdict in the case.  It would have been

of such little weight in the minds of a reasonable juror that this issue does not permit habeas

relief.

### F.  Detective Sanford's Testimony

Detective B. J. Sanford found Petitioner's SUV.  He was asked at trial to identify

photographs of the SUV and Ms. Maness's car.  The prosecutor asked if there was anything

in the pictures that Sanford thought was compelling or important with regard to his

investigation.  Sanford answered: "Yes, sir, the damage matched.  You could see where the

black SUV had come over on the white car.  There was smears from the paint on both

vehicles.  And there was also rubber from the tire from the black SUV on the white vehicle."

Tr. 304.

Petitioner argues that defense counsel should have objected to this testimony as not

being supported by scientific evidence.  The prosecution did not purport to offer Sanford as

an expert witness or imply that the comparison of the damage to the vehicles went beyond

what any person could readily observe.  Petitioner inflates the use of the term "matched" to

try to make the testimony sound of greater significance than what it was in the context of the

trial.  Sanford's observation was likely permissible lay testimony so that an objection would

not have succeeded.  Even if it had succeeded, there is no reason to believe that the exclusion of that testimony, when the jury could look at the photographs for themselves, would have changed the verdict in the case.

### G.  Comment on Silence

The following exchange occurred near the end of Detective Sanford's direct examination by the prosecutor:

> Q.    All right.  Mr. Langston never made any statement to you about this incident did he?
>
> A.    No, sir.  He would not.
>
> Q.    None at all?
>
> A.    No, sir, he refused - - - The night he was brought from Caddo jail to our jail I came up there and he said he didn't want to talk to me so we terminated the interview.
>
> Q.    And you're aware that that's his constitutional right not to ...
>
> A.    Yes, sir.
>
> Q.    ... give any statement.  And when he told you he didn't want to talk you stopped at that point?
>
> A.    Yes, sir.

Tr. 307-08.

Due process prohibits a prosecutor from pointing to the fact that a defendant was silent after he heard Miranda warnings, Doyle v. Ohio, 96 S.Ct. 2240 (1976), but the rule does not apply where a suspect has not received the warnings' implicit promise that any

silence will not be used against him.  Salinas v. Texas, 133 S.Ct. 2174, n.3 (2013), citing

Jenkins v. Anderson, 100 S.Ct. 2124 (1980).  Petitioner argues that counsel should have

objected to this testimony on the grounds that it violated Doyle.

Petitioner was in custody at the time of this conversation, but he has not pointed to any

evidence in the record to show that he was given his Miranda rights prior to the conversation.

There is a significant likelihood that officers would have followed the correct procedure and

administered the warnings before questioning, but there is no readily apparent evidence of

that.

Petitioner raised a Doyle error on direct appeal, and the appellate court apparently

assumed that Miranda warnings had been administered.  It determined that defense counsel's

lack of a contemporaneous objection to the testimony procedurally barred the issue on

appeal.  Part of the discussion was whether any error was so substantial as to require review

despite the lack of objection.  The court then went into the merits of the Doyle claim and

determined that the testimony, "although improper under Doyle, did not rise to such a level

that it cast substantial doubt on the reliability of the fact-finding process." State v. Langston,

3 So.3d at 716.  The court then turned to the claim before this court, whether counsel

rendered ineffective assistance when he did not object to the reference to post-arrest silence.

The court assumed there was deficient performance but found no reasonable probability that

the outcome of the trial would have been different had the objection been raised.  The

testimony was brief, acknowledged that the suspect had a constitutional right to remain silent,

and there was substantial evidence of guilt.  The court found that these factors did not present a reasonable probability that the jury would have returned a different verdict had counsel made the objection.  State v. Langston, 3 So.3d at 717-18.

That determination of the Strickland claim precludes federal relief if fairminded jurists could disagree on the correctness of the state court's decision.  That is certainly the case.  The reasons given by the court were rational and persuasive.  There might be a few persons who would disagree and argue that a different result should apply, but the state court decision stands so long as there are grounds for reasonable disagreement on the issue.  Habeas relief is not allowed.

**H.  Other Crimes Evidence**

Petitioner argues that counsel was ineffective when he did not object to the prosecutor introducing testimony of "other crimes" committed by Petitioner in connection with his arrest.  Detective Sanford testified that he was involved in the arrest of Petitioner at the Pier Apartments in Shreveport.   The prosecutor asked where Petitioner was located in the apartment.  Sanford answered, "He was behind the refrigerator."  The prosecutor asked what he was doing there, and Sanford said, "He was attempting to evade the K-9 that was sent in to bring him out."  Tr. 306.

The prosecutor later stated that he had intended to call as witnesses the Shreveport officers who made the arrest, but counsel had instead agreed that Detective Sanford could testify about those events.  Sanford described how Petitioner was pulled out from behind the

refrigerator by Shreveport officers and Sanford, and Petitioner "attempted to disarm one of the Shreveport officers" when he tried to take a shotgun from him.  The officer pulled the trigger on the weapon, and Petitioner was hit in the bicep with a "less than lethal" round.  The reason for this line questioning became clear when the prosecutor asked the detective if this information had been made known to the media or public.  Sanford said that it had not, yet Petitioner's former jail-mate Larue had given Sanford a statement about his conversation with Petitioner and said that Petitioner described being shot with a bean bag.  Tr. 327-29.  That bolstered Larue's credibility.

The state court, without explanation, rejected this claim on post-conviction application.  This court must nonetheless determine what arguments or theories could have supported the state court's decision and ask whether it is possible fair-minded jurists could disagree that those arguments are inconsistent with the holding in Strickland.  Had counsel objected, the prosecution would have almost certainly argued that the evidence was admissible under the "res gestae" exception that is well known in Louisiana evidence law.  The rule is now reflected by L.C.E. art. 404(b)(1) that allows evidence of other crimes, wrongs, or acts "when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding."  Louisiana courts have applied the exception to admit evidence that a suspect resisted arrest or gave a false name to an officer, even if those events occurred well after the charged crime.  See, e.g., State v. Williams, 660 So.2d 919, 922 (La. App. 4th Cir. 1995); State v. Arrington, 738 So.2d 1087, 1092 (La. App.

4th Cir. 1999); and State v. Smith, 686 So.2d 137, 143 (La. App. 1st Cir. 1996).  Pretrial notice of intent to introduce res gestae evidence is not required.  State v. White, 57 So. 3rd 1078, 1084 (La. App. 2nd Cir. 2011).

It is perhaps debatable whether the evidence of the arrest should have been admitted had an objection been raised, but there is at least a substantial likelihood that the court would have admitted the evidence under the res gestae exception.  The arrest happened relatively soon after the crime, and Louisiana courts have often allowed similar evidence.  This provided a basis for the state court to reject this Strickland claim, and it is a basis that it is not an objectively unreasonable application of Strickland.  Relief on this claim must, therefore, be denied.

## I. Improper Closing Argument

ADA Cecil Campbell began his closing argument by reviewing the evidence, including the couple's violent history, the threatening text messages, similar damage to their cars, the testimony of Kevin Larue, and how Petitioner resisted police after the event.  He spoke about some of the anticipated jury charges such as basing the verdict on facts presented from the witness stand rather than supposition.  He mentioned consideration of the absence of fact, but then veered into this statement:

> Is there any absence of fact here?  I don't think so.  I mean, we had a lot more witnesses that we could have called and we could have been here a lot longer but I didn't think it was necessary because it would have been repetitive and it would have been the same thing over and over again.  And to me it was so clear and so convincing that I didn't think that was important.  If I made a

mistake, that's a mistake that I'll have to live with.  But I don't think that I did because I think that it is clear and convincing.  Tr. 357-65.

The prosecutor in State v. Smith, 554 So.2d 676 (La. 1989) made a similar argument that "many, many more witnesses could have been called, but it would have done nothing but drag this case out."  The Supreme Court stated that the "most elementary rule governing the limits of argument is that it must be confined to the record evidence and the inferences which can reasonably and fairly be drawn therefrom. ... Likewise, it has been recognized that it is impermissible for a prosecutor to indicate to the jury that he has additional evidence of the defendant's guilt which he did not present at trial."  Smith, 554 So.2d at 681.

The prosecutor's comment in Smith, when taken together with a number of other misstatements of fact and improper arguments was held to be reversible error.  That was a rare event.  The Supreme Court of Louisiana has acknowledged that it "has often criticized the improper arguments without finding that they constitute reversible error."  State v. Taylor, 669 So.2d 364, 374 (La. 1996).  That is because the court "will not overturn a guilty verdict on the basis of improper argument unless we are 'firmly convinced that the jury was influenced by the remarks and that they contributed to the verdict.'"  Id., quoting State v. Bates, 495 So.2d 1262, 1273 (La. 1986).

Defense counsel could not have anticipated the improper argument and prevented it from happening, but he could have objected after the fact, and his objection likely would have been sustained given the statement in Smith that such argument is improper.  The court might have then admonished the jury to ignore the suggestion that there were other witnesses

Page 22 of  27

the State could have called.  An objection would have also preserved the issue so that it might be raised on direct appeal.  It is perhaps conceivable that the trial court would have granted a mistrial based on the improper argument, but this appears to be the kind of error that would likely be remedied by an admonition rather than a mistrial, which would be appropriate only if an admonition was not sufficient to assure a fair trial.  See La. C.C.P. arts. 770 and 771.  Given the strength of the State's case, the brevity of the remark, and the lack of any suggestion as to what the additional witnesses might have offered, it is not likely that an objection would have resulted in either a mistrial or reversal on appeal.

To obtain relief under Strickland, the defendant must show that there is a reasonable probability that, had an objection been made, the result of the proceeding would have been different.  This requires a substantial, not just conceivable, likelihood of a different result. Richter, 131 S.Ct. at 791.  It is perhaps conceivable that the objection would have brought about a different result, but given the overall record and the applicable standard of review there is not a substantial likelihood.  The state court could have reasonably rejected the Strickland claim for these reasons.  Such a decision would not be such an extreme malfunction that fairminded jurists would all agree that it conflicted with Strickland.  The prosecutor committed an error, and counsel could have raised a valid objection, but it does not entitle Petitioner to relief under Section 2254(d) in this case.

### J. Impeachment of Kevin Larue

Petitioner argues that counsel should have done a better job of cross-examining Kevin Larue by pointing to inconsistencies between his trial testimony and a statement Larue gave Detective Sanford.  A transcript of the original interview shows that Larue told the detective that he had mentioned to Ms. Meyers (Petitioner's mother) that he encountered her son-in-law in the Shreveport jail and that he mentioned something about "killing her baby or her grandbaby actually ... to keep her and her daughter Jennifer from having it, or her."  Larue said Petitioner admitted that he ran Jennifer off the road, which led to his arrest, but he said he wouldn't do but about a month on it because his mom had money.  Larue described Petitioner as a "short, squat dude" with bruises all over him, scratches on his neck, and a big welt on his forearm.  He said Petitioner told him that he got the mark when he "tried to block the shotgun or something."  Larue said that he gave his statement freely because he had a six-year-old sister, and that's how old Petitioner's daughter was.  Tr. S711-13.

Petitioner argues that Larue should have been impeached by pointing out that Petitioner was 6' 1" and weighed 160 pounds at the time of his arrest, which is not "a short, squat dude."  He argues that his daughter was only two, not six, at the time the men were in jail.  Petitioner also quibbles with Larue's allegedly changing statements that Petitioner said he would rather kill his daughter than see her with another man, with "them," or with his mother-in-law.  Petitioner suggests that these areas were fertile ground to impeach Larue.

There may be some inconsistencies with regard to those rather minor points, but the significance of Larue's testimony was that Petitioner admitted to him that he ran Ms. Maness off the road.  That claim was backed up by the fact Larue knew about Petitioner being injured by the shotgun, which information had not been released to the public.  Counsel could have asked some additional questions and shown some inconsistencies with greater use of the prior statement, but that sort of impeachment would not have significantly undermined the witness.  Defense counsel may also have been wise to avoid exploring the transcript of Larue's statement to the detective.  It contains a statement, not explored by the prosecutor, that Petitioner told Larue that when he got out he was going to kill Ms. Meyers, Ms. Maness, and the lead detective in the case.

Counsel was not required to ask every possible question that might impeach Larue.  Counsel did attack Larue on cross-examination by exploring his criminal history, how Larue did not come forward with the story until he was moved to a Bossier jail, the lack of identifiable witnesses to the alleged conversation, and Larue's possible motivation to curry favor with his jailer.  Petitioner has, with the benefit of time to reflect, developed additional questions that might have been asked, but their absence does not give rise to a reasonable likelihood that the result would have been different if only those questions had been asked.  The state court's rejection of this claim, when viewed through the doubly deferential habeas standard, does not allow relief on this final claim.

Accordingly,

**IT IS RECOMMENDED** that the petition for writ of habeas corpus be denied.

### Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b).  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

An appeal may not be taken to the court of appeals from a final order in a proceeding under 28 U.S.C. § 2254 unless a circuit justice, circuit judge, or district judge issues a certificate of appealability. 28 U.S.C. § 2253(c); F.R.A.P. 22(b).  Rule 11 of the Rules Governing Section 2254 Proceedings for the U.S. District Courts requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the

applicant. A certificate may issue only if the applicant has made a substantial showing of the denial of a constitutional right. Section 2253(c)(2). A party may, within fourteen (14) days from the date of this Report and Recommendation, file a memorandum that sets forth arguments on whether a certificate of appealability should issue.

THUS DONE AND SIGNED in Shreveport, Louisiana, this 11th day of February, 2015.

Mark L. Hornsby
U.S. Magistrate Judge